[Cite as *State v. Schmitz*, 2012-Ohio-2979.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. Nos. 11CA010043 |
| | 11CA010044 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT |
| | ENTERED IN THE |
| DAVID W. SCHMITZ | COURT OF COMMON PLEAS |
| | COUNTY OF LORAIN, OHIO |
| Appellant | CASE Nos. 10CR081122 |
| | 10CR081326 |

DECISION AND JOURNAL ENTRY

Dated: June 29, 2012

---

MOORE, Presiding Judge.

{¶1} Defendant-Appellant, David Schmitz, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} Schmitz and Sandy Kalb met in the fall of 2007 when Schmitz hired Kalb to work alongside him as the administrative assistant for his computer company. At the time Schmitz hired Kalb, she was recovering from an ongoing addiction to heroin. Kalb and her family had struggled for years with Kalb's heroin addiction, and her addiction also soon became a focal point in Schmitz and Kalb's relationship. According to Schmitz, the two became romantically involved and, from that point on, he tried to aid Kalb in fighting her addiction. According to Kalb, she only used Schmitz to feed her addiction because he would give her money to purchase drugs. Schmitz' involvement with Kalb quickly affected other members of her family; namely, her parents and her older sister, Lisa Dietsche.

{¶3} Several events that occurred between February and April 2008 led Dietsche and her family to get a civil protection order against Schmitz. Kalb had resumed her heroin use by February 2008 and stole three checks from Schmitz to support her habit. On February 22, 2008, Kalb hysterically informed her family that Schmitz had placed a poster with pictures of Kalb and her five year old daughter outside a drug house she frequented in Cleveland. The writing on the poster read: "I miss my mommy. She is out getting high on heroin." Later that same day, Kalb's father, Bert Elgar, spoke with Schmitz on the phone. Schmitz informed Elgar that he had posted numerous pictures of Kalb, not just the ones she found on the poster. Elgar demanded that Schmitz find and remove the pictures, but Schmitz claimed that would be impossible because he had distributed hundreds of pictures. The following day, Elgar found a garbage bag with a bow attached to it outside his home. The bag contained pictures of Kalb that bore additional captions, such as "Dope, for dope" and "I don't cope. I use dope." A letter also was attached to the bag. In the letter, Schmitz purported to explain his rationale for the pictures, but also wrote:

> I've picked up nearly all of the pictures (244 – I tried) all of which have been destroyed except the enclosed 2 (only 2 different pictures printed) 24 are out there somewhere assuming I counted right. [T]he third picture I just printed thinking she may pull strenth (sic) and hope from looking at it. Sorry it did not come out all that great but I've pretty much destroyed the printer heads, used up 3 full sets of ink cartigdes (sic) and the picture was only 640x480 in resolution (good for a 4x6 inch print not 16x20)[.]

The letter also contained multiple statements encouraging Kalb's family to address their problems and seek help for Kalb.

{¶4} Matters escalated when Schmitz actually learned that Kalb had stolen three checks from him and had been arrested for heroin possession. After Kalb entered a rehabilitation center, Schmitz left a box at a Greyhound bus station near the center. The box contained several items for Kalb, including food, a cell phone, letters, and some clothing. Kalb's sister Dietsche, a

detective for the Elyria Police Department, was contacted about the box because it was labeled with Kalb's name, but also identified Kalb as the sister of Detective Lisa Dietsche. Schmitz also sent two emails to Kalb's father. In the emails, Schmitz complained about Kalb having taken money from him and asked Bert Elgar to give Kalb a message. Specifically, he asked him to tell Kalb that, if she did not speak with Schmitz and arrange to repay him for the money she stole, he would, as a public service announcement, give "every household in [L]orain" a picture of Kalb and her daughter entitled "I miss my mommy. She is an addict. Are you or someone you know?" Schmitz also wrote:

> You can forward this to police – they will tell me to knock it off
>
> You can try to sue over pic – however I am almost done digitally creating psa from scratch – the likeness is coincedental – case won't hold
>
> you could shoot me – if you could find me
>
> you could let me run with it – not much of choice
>
> or [Kalb] can make amends

(Sic.) Schmitz further wrote: "If I have to spend money I'd just assume 'destroy' [Kalb] after what she has done to me." Around the same period of time, Schmitz decided to press charges against Kalb for the checks she had stolen.

{¶5} Due to Schmitz' alarming behavior, Dietsche and her parents filed a criminal complaint against him in Oberlin Municipal Court. Schmitz ultimately pleaded guilty to disorderly conduct, and the court issued a suspended sentence as well as a no contact order, directing Schmitz not to contact Kalb's family. After the no contact order issued, however, Schmitz entered the Elyria Police Department and left an envelope addressed to Dietsche, containing a St. Ann's coin that identified St. Ann as the patron saint of mothers and included the following note: "Hold onto until she's ready for sure." Schmitz did not give his name at the

police department, but Dietsche viewed the surveillance tape from the lobby and recognized Schmitz. As a result of the incident, Schmitz was found in violation of the no contact order and spent 30 days in jail.

{¶6} Subsequently, Schmitz and Kalb resumed their relationship for a period of time until Kalb once again ended it in January 2009. Schmitz then began sending Kalb letters. In one particular letter, Schmitz blamed Kalb for ruining his Christmas holiday and wrote: "I think I'll quit being a chicken s*** and blow up my brains on your parents['] front yard this July [4th.] * * * Going to die anyway, right?" Schmitz also opened a MySpace account, listed his username as Kalb's, and began posting a variety of messages about Kalb's family. All of the messages indicated they were posted by "Sandy B nee Elgar Kalb." In one particular message posted November 18, 2009, Schmitz wrote that Kalb used him:

> to the point where her and her older sister lisa dietsche are only 2 people in the world I'd like to see (you guess). [H]er sister more so. [H]ell if my treatment don't work who knows. If it does when no contact order is up I am going to have some fun – that's for sure.

Schmitz posted that Dietsche was "always medling (sic)" and had "railroaded" him through her detective contacts, ensuring that he received 30 days in jail for simply dropping off Kalb's St. Ann's coin to Dietsche. Just over a week later, Schmitz posted another message in which he claimed that he had found a house he was interested in buying but could not buy it because Dietsche lived next door. In his message, Schmitz named Dietsche's street and wrote: "could you imagine me living there I'd surely be arrested * * *."

{¶7} Schmitz' behavior further escalated as the summer of 2010 began. An officer in Dietsche's department was killed in the line of duty, and the department organized a 5k event to honor the fallen officer. The department created a Facebook page to advertise the 5k. Schmitz also created a Facebook page and posted on his page that he planned to attend the event.

Schmitz wrote: "elyria (sic) patrolmen don't want to be friends with me – none the less will be walking [] 5k backwards * * *." He also posted a message on the police department's Facebook page in which he referenced Dietsche, her "junkie sister," and "all of the crap that Lisa Dietsche and her junkie sister Sandy Kalb put me through." Later the same week, Schmitz posted a message on his Facebook page that he planned to fly a kite at Maude Memorial Park; the park nearby Dietsche's home where she often took her infant son to walk. Schmitz later wrote in the same message string that, although he tried a different park because "maude has to (sic) many trees," he might as well fly and break all of his kites because they "won't do me any good soon enough * * *." Several hours later, he posted another message in which he wrote that he "probablly (sic) shouldn't post when where I'll be – crazy stalker [might] follow me – then I'd have to kill her."

{¶8} As a result of her growing concern over Schmitz' messages, Dietsche decided to notify her supervisors of the situation as well as the police department near her home. One week after Dietsche notified her local police department about Schmitz, she noticed a truck following behind her car while she and her infant son were driving home from a visit to her parents. Dietsche called her husband, a fellow police officer, and asked him to run the truck's license plates. Her husband then informed her that the truck belonged to Schmitz. Dietsche panicked and called the police dispatch, but also managed to throw her car into reverse and pull behind Schmitz when the two stopped at a red light close to her home. When the light changed, Schmitz pulled into a Rite Aid and Dietsche waited in a nearby parking lot until the police arrived. The incident caused Dietsche to pursue charges against Schmitz and to file for a protection order.

{¶9} The first indictment against Schmitz (Lorain County Court of Common Pleas Case No. 10CR081122) issued on August 12, 2010, and contained the following three counts: (1)

retaliation, in violation of R.C. 2921.05(A); (2) menacing by stalking, in violation of R.C. 2903.211(A)(1); and (3) identity fraud, in violation of R.C. 2913.49(B)(1). Four days later, Dietsche obtained the protection order she had sought the previous month. Nevertheless, Dietsche saw Schmitz nine days later while she was on duty. On August 24, 2010, Dietsche drove to the Lorain County Justice Center to bring grand jury packets to the prosecutor's office. Dietsche and Schmitz saw one another while Dietsche was parking her detective car and Schmitz was walking on the courthouse sidewalk. Schmitz continued to walk toward Dietsche until he almost reached her vehicle. He then veered quickly to walk around the corner of the courthouse, opting to cut through the landscaping rather than remain on the sidewalk. Dietsche dismissed the incident until she saw Schmitz again inside the courthouse. When Dietsche exited the third-floor prosecutor's office, she saw Schmitz walking behind two elderly women on the opposite side of the hallway. Dietsche held her ground while Schmitz walked in her direction and stared at her. As Schmitz drew closer, he "smirk[ed]" at Dietsche, then continued walking until he rounded a corner and Dietsche lost sight of him. Dietsche immediately returned to the prosecutor's office and informed them of the situation. Although several investigators from the prosecutor's office searched the Justice Center, they did not find Schmitz.

{¶10} The incident at the Justice Center led to the issuance of another indictment. In Lorain County Court of Common Pleas Case No. 10CR081326, a grand jury indicted Schmitz on two counts: (1) violating a protection order, in violation of R.C. 2919.27(A)(2); and (2) menacing by stalking, in violation of R.C. 2903.211(A)(1). The trial court agreed to consolidate the two indictments against Schmitz for trial, as both cases arose from the same course of conduct. A jury trial then took place. The jury found Schmitz guilty on all counts, but in the case arising from the second indictment (Case No. 10CR081326), only found Schmitz guilty of

misdemeanor menacing rather than the felony menacing for which he was indicted. The court issued two separate sentencing entries, but ordered the sentences to be served consecutively. The court sentenced Schmitz to a total of five years, seven months in prison.

{¶11} Schmitz appealed from both cases, and this Court consolidated the two cases on appeal. Schmitz' consolidated appeal is now before this Court and raises three assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED TO THE DETRIMENT OF SCHMITZ BY NOT ORDERING A MISTRIAL.

{¶12} In his first assignment of error, Schmitz argues that the trial court erred by not declaring a mistrial after two jurors admitted to having discussed the case with people outside the jury. We disagree.

{¶13} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely affected." *State v. Wooden*, 9th Dist. No. 21138, 2003-Ohio-1917, ¶ 33, quoting *Wadsworth v. Damberger*, 9th Dist. No. 3024-M, 2000 WL 1226620, *2 (Aug. 30, 2000). If a defendant fails to move for a mistrial once he discovers the grounds that would form the basis for his motion, then he forfeits all but a claim of plain error. *State v. Wood*, 9th Dist. No. 06CA0044-M, 2007-Ohio-2673, ¶ 21-23.

> Under Crim.R. 52(B), [p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be

> plain within the meaning of Crim.R. 52(B), an error must be an obvious defect in the trial proceedings. Third, the error must have affected substantial rights. We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.

(Internal citations and quotations omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Schmitz sets forth the plain error standard of review, but also asserts that it is "unclear" whether the plain error standard applies. According to Schmitz, the standard is "unclear" because his attorney moved for a mistrial at one point, but then did not continue with his objection.

{¶14} The transcript citations Schmitz provides for defense counsel's mistrial request do not contain a mistrial request. In fact, defense counsel never once uttered the word "mistrial" in the court below. Defense counsel referred to the juror misconduct issue as "relatively innocuous" and only ever asked the court to: (1) voir dire all the jurors on the issue, (2) dismiss one or both of the affected jurors, and (3) admonish the remaining jurors. The court ultimately acted in accordance with defense counsel's requested relief. Far from having preserved the mistrial issue, only a generous reading of the transcript supports the conclusion that Schmitz forfeited, rather than waived, it. *See, e.g., State v. Hale*, 9th Dist. No. 16251, 1994 WL 64377, *1-2 (Mar. 2, 1994) (defendant waived mistrial argument when defense counsel withdrew motion for mistrial and requested that the trial continue). Assuming that Schmitz did forfeit rather than waive the mistrial issue, the record reflects that the trial court did not commit plain error.

{¶15} "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror." *State v. Phillips*, 74 Ohio St.3d 72, 88 (1995). "In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial

or to replace an affected juror." *Id.* at 89. Furthermore, "[a] juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *Id.*

{¶16} Before deliberations commenced, the trial judge notified the attorneys that a fellow jurist had called to inform him that Juror 1 contacted him and asked whether defendants have access to the personal information jurors list on their questionnaires. The court then voir dired each juror. Jurors 2, 3, 5, 7, 8, 9, and 13 were unaware of any outside conversation Juror 1 had or any matters concerning Juror 1. Jurors 6, 10, and 12 were not aware of Juror 1's outside conversation, but had heard Juror 1 express his personal opinion of Schmitz. One of those jurors heard Juror 1 refer to Schmitz as "weird" while the others heard Juror 1 say that Schmitz was guilty. Nevertheless, all three jurors averred that Juror 1's comments would not affect their ability to remain impartial. Juror 11 indicated that she vaguely heard Juror 1 reference having contacted someone to get advice on how the proceeding would take place. Juror 11 could not be any more specific in regard to the details of Juror 1's reference, but admitted that she had had concerns about the confidentiality of questionnaires. Juror 11 stated that she asked her husband about that issue before the trial began when she first received her juror questionnaire. Juror 11 averred that she no longer had the same concerns about her privacy and that she could continue to be impartial.

{¶17} Juror 4 learned from Juror 1 that he was friends with a judge and had asked the judge about the confidentiality of juror questionnaires. The result of the conversation was simply that Juror 1 told Juror 4 that jury information is a matter of public record. Juror 4 also indicated, however, that earlier in the day she had heard Juror 1 offer his opinion as to Schmitz' guilt. Specifically, Juror 1 indicated that he knew Schmitz to be guilty and nothing would

change his mind about that conclusion. Juror 4 averred that, despite her interactions with Juror 1, she could remain impartial.

{¶18} The trial court dismissed Juror 1 and reinstructed the jury about the importance of following the court's instructions not to discuss the matter with anyone and not to form an opinion about the case until its completion. Schmitz makes no attempt to explain why the trial court's response did not sufficiently negate the need for a mistrial. *See* App.R. 16(A)(7). His argument amounts to a blanket assertion that a mistrial was warranted because both Juror 1 and Juror 11 discussed the case with outside parties. As explained above, however, Juror 11 did not discuss "the case" with her husband. She talked with him about the jury questionnaire she completed and did so before the case even began. And while Juror 1 did contact an outside party during the trial, the trial court dismissed Juror 1. All of the other jurors averred either that they were unaware of what Juror 1 had done or that they could remain impartial despite Juror 1's misconduct. *See Phillips*, 74 Ohio St.3d at 88. Schmitz has not shown that the trial court committed plain error. His first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE EVIDENCE PRESENTED AT TRIAL WAS NOT SUFFICIENT FOR SCHMITZ'S CONVICTION.

{¶19} In his second assignment of error, Schmitz argues that his retaliation, menacing by stalking, and identity theft convictions are based on insufficient evidence. Because Schmitz does not challenge his conviction for violating a protection order, we limit our discussion to his remaining convictions.

{¶20} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

"In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

**{¶21}** Initially, we address the statement in Schmitz' brief that "[t]hroughout the trial it [was] not clear that Dietsche was the complainant for the charges of menacing by stalking and retaliation." With the exception of the identity theft charge that pertained to Kalb, all of the charges in the two indictments stemmed from Schmitz' conduct toward Dietsche. The charges against Schmitz commenced on May 14, 2008, the day he entered the Elyria Police Department with the St. Ann's coin while subject to a no contact order. Although the State offered testimony and evidence of events preceding May 14, 2008, the record reflects that it did so to provide context for the charges. With that in mind, we turn to the individual charges.

**Menacing by Stalking**

**{¶22}** The menacing by stalking statute forbids any person from "engaging in a pattern of conduct [that] shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." R.C. 2903.211(A)(1). Generally, menacing by stalking is a first-degree misdemeanor. R.C. 2903.211(B)(1). Certain conditions will elevate the offense to a felony, however, including instances where the offender "made a threat of physical harm to or against the victim" or committed the offense while subject to a protection order. R.C. 2903.211(B)(2)(b), (g). The phrase "pattern of conduct" means "two or more actions or incidents closely related in time,

whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). "Mental distress" means:

> (a) Any mental illness or condition that involves some temporary substantial incapacity; [or]
>
> (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2)(a)-(b). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶23} First, Schmitz argues that his convictions for menacing by stalking are based on insufficient evidence because the State failed to set forth any evidence of Dietsche's mental distress. Dietsche stated several times during her testimony that she felt threatened by Schmitz. When Schmitz brought a St. Ann's coin to the Elyria Police Department and Dietsche found the coin in her department mailbox along with a note declaring, "[h]old onto until she's ready for sure," Dietsche testified that she was alarmed because she did not know who brought the coin and the letter did not indicate who the sender was. Because Dietsche had just publicly announced her own pregnancy, she was concerned about the patron saint of motherhood coin and its cryptic note. Her level of concern caused Dietsche to bring the incident to the attention of her supervisors. She then watched the recorded surveillance tapes from the police lobby and recognized Schmitz.

{¶24} Dietsche testified that she gradually became more concerned as Schmitz' behavior escalated. From February 2009 until summer 2010, Schmitz repeatedly posted messages of

concern on MySpace and Facebook. Dietsche stated she was particularly concerned when she learned through Schmitz' posts that he knew where she lived. In one particular MySpace message, Schmitz also wrote that Dietsche and her sister were the only two people in the world he would like to see "you guess." Dietsche testified that she absolutely felt threatened by that message because she believed Schmitz meant he would like to see her dead. Dietsche then became even more afraid when Schmitz posted a message about flying a kite in a park near her home. She explained her fear increased because Schmitz described the park as having too many trees, meaning that he must have actually been to the park Dietsche often frequented with her infant. Dietsche felt that Schmitz might be planning to kill her, given that he also wrote that (1) it did not matter if his kites broke because they "[wouldn't] do [him] any good soon enough * * *," and (2) if his "crazy stalker" followed him he would "have to kill her." Dietsche testified that she felt Schmitz was referring to her as his "crazy stalker" because Schmitz had previously tried to tell the police that Dietsche was the stalker, not him. Dietsche's fear peaked when she had her son in the car with her on July 9, 2010, and discovered Schmitz was following behind her. Dietsche testified that she "freak[ed] out" during the incident and screamed while on the phone with the police dispatcher.

{¶25} Apart from any specific, individual event that occurred, Dietsche testified that she came to fear Schmitz in general because she viewed him as a "loose cannon" and believed his behavior continually escalated. Dietsche testified that Schmitz' entire pattern of behavior led her to believe that he would harm her and that she feared for her own safety as well as her family's safety. Schmitz claims there is insufficient evidence to sustain his conviction because Dietsche never actually said that she was incapacitated or required treatment. *See* R.C. 2903.211(D)(2)(a)-(b) (mental distress defined). Viewing the evidence in a light most favorable

to the State, however, a rational trier of fact could have concluded that the State set forth sufficient evidence of Dietsche's mental distress. This Court has held that:

> [E]xpert testimony is not necessary to establish that a victim experienced mental distress as a result of the offender's behavior in order to prove an element of menacing by stalking. Rather, it is the function of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's behavior. Furthermore, no evidence that psychological treatment has been undertaken is necessary.

*State v. Hart*, 9th Dist. No. 00CA007543, 2000 WL 1824892, *3 (Dec. 13, 2000). Dietsche repeatedly testified that she felt threatened by Schmitz and feared for her life as well as for the safety of her family due to the escalating pattern of menacing behavior in which Schmitz engaged over an extended period of time. The record supports the conclusion that the State set forth sufficient evidence of mental distress. *See State v. Smith*, 9th Dist. No. 25869, 2012-Ohio-335, ¶ 21 ("Taken together, in light of [the victim's] apparent fear of [the defendant], a reasonable trier of fact could conclude that [he] had knowledge that his actions in driving past [the victim's] aunt's home, pausing in front of [it], driving by again, and then following her in his truck would cause [her] to believe that he would harm her.").

{¶26} Second, Schmitz argues that his convictions for menacing by stalking are based on insufficient evidence because the State failed to prove that he engaged in a pattern of conduct. He argues that the State failed to set forth two or more stalking incidents "closely related in time." R.C. 2903.211(D)(1). In his argument, Schmitz repeatedly refers to testimony and evidence describing events that took place before February 6, 2009. As set forth above, however, the State only provided certain evidence for context, not as the basis for any of the actual charges against Schmitz. The menacing by stalking charge in Schmitz' first indictment pertained to acts he committed between February 6, 2009, and July 9, 2010. The second menacing by stalking charge pertained to acts Schmitz committed on August 24, 2010. The

events that took place before February 6, 2009, therefore, were not the basis for any of the charges against Schmitz.

**{¶27}** "To determine whether two or more incidents were closely related in time, the incidents in question should be resolved by the trier of fact considering the evidence in the context of all the circumstances of the case." (Internal quotations omitted.) *State v. Payne*, 178 Ohio App.3d 617, 2008-Ohio-5447, ¶ 12 (9th Dist.). As to the menacing conviction arising out of Schmitz' first indictment, Dietsche testified that, from February 2009 until the early summer of 2010, Schmitz posted a variety of messages on MySpace about her. Back to back messages on June 28, 2010 referenced Schmitz having visited a park near Dietsche's home and Schmitz having "to kill" his "crazy stalker." Then, on July 9, 2010, Schmitz followed Dietsche and her infant son in his truck while she drove home from visiting her parents. The record belies Schmitz' assertion that "[n]one of the acts [the State] delineated were closely related in time." As to the menacing conviction arising out of Schmitz' second indictment, Dietsche testified that Schmitz saw her and walked toward her twice at the Lorain County Justice Center; once on the sidewalk, and once on the third floor of the building. To the extent Schmitz argues that he possessed valid reasons for being in certain places and did not intend to engage in a pattern of menacing conduct, that argument sounds in weight, not sufficiency. Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that the State proved that Schmitz engaged in a pattern of conduct. Accordingly, Schmitz' argument that his convictions for menacing by stalking are based on insufficient evidence lack merit.

**Retaliation**

**{¶28}** R.C. 2921.05(A) provides:

No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or

witness who was involved in a civil or criminal action or proceeding because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness.

Whoever commits the foregoing offense is guilty of retaliation. R.C. 2921.05(C).

{¶29} As outlined above, to obtain a conviction for menacing by stalking, the State must prove that an offender caused a person either to (1) believe the offender would cause physical harm to that person, or (2) suffer from mental distress. R.C. 2903.211(A)(1). The jury completed an interrogatory when reaching its verdict on the first menacing by stalking charge. In the interrogatory, the jurors found that Schmitz did not make a threat of physical harm toward Dietsche while committing the offense of menacing by stalking. Accordingly, the jury convicted Schmitz on the basis that he caused Dietsche mental distress. Schmitz now points to the interrogatory relevant to the menacing by stalking charge to defend against his conviction for retaliation. Schmitz reasons that his retaliation conviction, requiring force or an unlawful threat of harm, is based on insufficient evidence because the jury specifically found that he did not threaten Dietsche with physical harm.

{¶30} "[T]here is no requirement that a jury reach consistent verdicts between separate counts * * *." *State v. Zander*, 9th Dist. No. 24706, 2010-Ohio-631, ¶ 57. Moreover, the elements of menacing by stalking and retaliation are not the same. Menacing by stalking requires a belief "that the offender will cause physical harm" while retaliation requires an "unlawful threat of harm." *Compare* R.C. 2903.211(A)(1) *with* R.C. 2921.05(A). Menacing by stalking only governs harm to "the other person" who is the subject of the offender's menacing while retaliation governs an unlawful threat "to any person or property." *Compare* R.C. 2903.211(A)(1) *with* R.C. 2921.05(A). Schmitz makes no attempt to address the differences between the two statutes. *See* App.R. 16(A)(7). In any event, the jury was not bound by its

answer to the interrogatory related to the menacing by stalking charge when it then considered the retaliation charge. *Zander* at ¶ 57. The trial court specifically instructed the jury to "consider each count in the indictment as a separate and distinct matter." Schmitz has not raised any other ground for challenging his retaliation conviction on the basis of sufficiency. As such, we reject Schmitz' argument that his retaliation conviction is based on insufficient evidence.

**Identity Fraud**

{¶31} "No person, without the express or implied consent of the other person, shall use, obtain, or possess any personal identifying information of another person with intent to * * * [h]old the person out to be the other person." R.C. 2913.49(B)(1). Whoever violates the foregoing provision is guilty of identity fraud. R.C. 2913.49(I)(1).

{¶32} Schmitz argues that his identity fraud conviction is based on insufficient evidence because everyone knew the MySpace page he created actually belonged to him and not Kalb. According to Schmitz, he never intended to hold himself out as Kalb. He only used Kalb's name as his "alter-ego."

{¶33} At trial, Schmitz admitted that he created the MySpace page and posted its entries. The MySpace exhibit the State introduced informs the reader on the top of the page that "[S]andy [K]alb has joined MySpace!" Farther down the page, the exhibit reads "sandy b nee elgar kalb's MySpace Blog." Moreover, every posted message on the page ends with "Posted by sandy b nee elgar kalb," "Posted by sandy kalb," or "Posted by Sandy Kalb nee Elgar." None of the entries identify Schmitz as the author. Although the individuals who testified at trial knew that Kalb was not responsible for the content of the MySpace page, they reached that conclusion because they knew Kalb and were aware of the situation between Kalb and Smith. It would be reasonable for any person reading the page without the benefit of that additional information to

assume Kalb authored one or more of the posts on the MySpace page. Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that the State proved the elements of identity fraud. Schmitz' argument that his identity fraud conviction is based on insufficient evidence lacks merit. His second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

SCHMITZ'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶34} In his third assignment of error, Schmitz argues that his convictions are against the manifest weight of the evidence.

{¶35} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶36} Rather than set forth a separate manifest weight argument, Schmitz limited the analysis in his brief to two statements:

> The arguments that Schmitz's conviction was against the manifest weight of the evidence are the same as the arguments that the relevant convictions were against the sufficient weight of the evidence. Therefore, the arguments will not be rewritten here but are incorporated as if fully rewritten.

Although Schmitz captions his assignment of error as a weight challenge, he fails to set forth "any argument concerning the credibility of the evidence presented or the weight of the credible evidence." *State v. Wilson*, 9th Dist. No. 25100, 2011-Ohio-4072, ¶ 21. "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *Thompkins* at 386. This Court will not conduct a manifest weight analysis when an appellant has not developed a manifest weight argument. *Wilson* at ¶ 21. Because Schmitz has not developed a manifest weight argument, we do not consider the merits of his assigned error. Schmitz' third assignment of error is overruled.

### III.

**{¶37}** Schmitz' assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

BELFANCE, J.
CONCURS IN JUDGMENT ONLY.

DICKINSON, J.
CONCURRING.

{¶38} I concur in the majority's judgment and all of its opinion except its refusal to reach the merits of Mr. Schmitz's third assignment of error. I would overrule that assignment of error because the jury did not lose its way and create a manifest miscarriage of justice by believing the prosecution's evidence. *See State v. Otten*, 33 Ohio App. 3d 339, 340 (9th Dist. 1986).

APPEARANCES:

KENNETH N. ORTNER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.