[Cite as *State v. Yoder*, 2016-Ohio-7428.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | C.A. No. 15AP0017 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ADEN S. YODER | WAYNE COUNTY MUNICIPAL COURT COUNTY OF WAYNE, OHIO |
| Appellant | CASE No. 2014 CRB 001621 |

DECISION AND JOURNAL ENTRY

Dated: October 24, 2016

WHITMORE, Judge.

{¶1} Appellant, Aden S. Yoder, appeals from the April 28, 2015 judgment of the Wayne County Municipal Court. This Court affirms.

I

{¶2} In January of 2014, A.Y. decided to end her romantic relationship with Mr. Yoder, but was open to an ongoing friendship. However, between January and September of 2014, their friendship ended due to a series of events culminating in Mr. Yoder's arrest.

{¶3} Mr. Yoder was charged with one count of menacing by stalking, in violation of R.C. 2903.211(A)(1), a misdemeanor of the first degree. Mr. Yoder pleaded not guilty and a bench trial ensued.

{¶4} At trial, A.Y. and Patrolman Nicholas Myrda testified on behalf of the State. Mr. Yoder did not call any witnesses to testify on his behalf.

{¶5} The trial court found Mr. Yoder guilty of menacing by stalking, stating:

I believe the State has proven its case beyond a reasonable doubt that you engaged in a pattern of conduct that led [A.Y.] [to] belie[ve] that you would hurt her * * * or her friend, or shoot them. Those were her statements. The relationship ended sometime in January. [A.Y.] thought that you could be friends and then during that period of time your behavior was aggressive. [A.Y.] was afraid of you because of your anger. She said that you would call and ask who she was with, where she was going, and monitoring her closely, not in a way that a simple friend would. And then there was the culmination of the incident that occurred after you saw [A.Y.] at the restaurant. So, I believe that we certainly have a pattern of conduct. It's been corroborated by [Patrolman] Myrda's review of 20 [voicemail] messages that were left. That's an excessive number of [voicemail] messages where you are angry, or upset, or apologizing and/or cursing. It seems to me that [A.Y.][]testified clearly here today about the incident that occurred in the parking lot and * * * I don't have any difficulty believing her as a credible witness. * * *

**{¶6}** After a presentence investigation, the trial court sentenced Mr. Yoder as follows: (1) $500 fine; (2) 18 months community control; and (3) 60 hours of community service. Mr. Yoder was also ordered to get and maintain gainful employment, and have no contact with A.Y., her property, or her family.

**{¶7}** Mr. Yoder now appeals, raising one assignment of error.

II

Assignment of Error

MR. YODER'S CONVICTION FOR [] MENACING BY STALKING IN VIOLATION OF R.C. 2903.211(A)(1) IS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶8}** In his sole assignment of error, Mr. Yoder argues that his conviction for menacing by stalking[1] is not supported by sufficient evidence, and is against the manifest weight of the evidence. We disagree.

---

[1] Mr. Yoder states that he is challenging his conviction for "aggravated menacing by stalking." However, the record clearly indicates that Mr. Yoder was charged with, and convicted of, menacing by stalking, in violation of R.C. 2903.211(A)(1). We proceed with our discussion accordingly.

**Sufficiency**

{¶9} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

{¶10} R.C. 2903.211(A)(1) states, in relevant part, that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person * * *." "The phrase 'pattern of conduct' means 'two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents.'" *State v. Schmitz*, 9th Dist. Lorain Nos. 11CA010043, 11CA010044, 2012-Ohio-2979, ¶ 22, quoting R.C. 2903.211(D)(1). "Mental distress" means:

> (a) Any mental illness or condition that involves some temporary substantial incapacity; [or]
> (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2)(a)-(b). Further, "[a] person acts knowingly, regardless of purpose, when the person is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when [he] is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶11} Here, Mr. Yoder specifically argues that his conviction for menacing by stalking is not supported by sufficient evidence because the State failed to present evidence that: (1) he engaged in a pattern of two or more behaviors closely related in time; (2) A.Y. suffered mental distress as defined in R.C. 2903.211(D)(2)(a)-(b), or Mr. Yoder made threats of physical harm; and (3) he should have known that his actions were likely to cause A.Y. mental distress or fear of physical harm.

{¶12} A.Y. testified that she had dated Mr. Yoder for "[a]bout six months," and that they "broke up" in January 2014, because her feelings for him had changed and she was "scared of" his anger. A.Y. explained that Mr. Yoder would raise his voice at her and she was "scared by the raising of the voice." She testified, "I told him that I would still be his friend, like wave at him, talk to him whenever I ran into him and it got to the point where he called me every day and finally he was asking me where I was going, who I was with, and everything that I told him * * * he told me that he doesn't believe me." According to [A.Y.], the excessive calling began at the end of January, or beginning of February, and ended approximately in June. [A.Y.] stated:

> [Mr. Yoder] called me one morning. I was getting ready for my aunt's funeral.* * * And when I answered he * * * asked me if I saw him at Fiore's the night before. [Mr. Yoder] said no you didn't see me [because] you were all over your boyfriend. And then [Mr. Yoder] said now that I know what your boyfriend looks like * * * one of these times you are going to be somewhere with your boyfriend and I'm going to walk in and you won't know that I'm there and * * * I won't guarantee what will happen. But it will be something you don't like.

[A.Y.] testified that she believed these words to mean that Mr. Yoder "was [] going to come in somewhere and hurt us or shoot us." After that particular conversation, [A.Y.] stated that she no longer answered Mr. Yoder's telephone calls. Additionally, she contacted the police and gave a statement regarding this incident.

{¶13} [A.Y.] also testified about a subsequent incident in September of 2014, wherein Mr. Yoder pulled behind her in a parking lot and attempted to approach her vehicle on foot, stating:

> [Mr. Yoder] [] pulled in behind me and as I was getting out of the van into my car he yelled over, he tooted his horn and yelled over, "[a]ren't you even going to talk to me?", and I just continued to my car. And as I was pulling out he was pulling out of the Apple Creek doctor's office, * * * and he motioned me to come over, pull over [be]cause he wanted to talk to me. And when I came out to the stop sign there on 250 he was parked, he was right behind me and we had to wait on traffic and he parked his van, put his van in park and he was going to come up to the car and talk to me. Traffic was so that I could go and I left.

The record indicates that [A.Y.] also reported this incident to the police.

{¶14} Patrolman Myrda testified that, during the months of January 2014, through September 2014, he was employed by the Apple Creek Police Department. He explained that he met with [A.Y.] regarding Mr. Yoder's comment that "sometime he was going to run into [her boyfriend] and when they were least expecting it he will not promise what will happen." As part of the investigation, Patrolman Myrda stated:

> we sat down and [] listened to all the voicemails because I believe [Mr. Yoder] left between 15 to 20 voicemails of different * * * emotional status from being angered to apologizing, cussing, most of them were in Dutch so I didn't, I could get bits and pieces of it. But then after getting statements from [A.Y.][,] I contacted Mr. Yoder * * * [and] advised him of the complaint and that he needed to stop, you know, talking, going to her house, just leave her alone and [Mr. Yoder] advised he would do so and he would not give me any other issues.

Patrolman Myrda indicated that he spoke with Mr. Yoder on July 23, 2014. He further testified that, in September of 2014, A.Y. contacted him about the parking lot incident. Again, Patrolman

Myrda telephoned Mr. Yoder and advised him of A.Y.'s complaint. Finally, Patrolman Myrda described A.Y.'s demeanor, after both incidents, as concerned, fearful, somewhat anxious, and upset.

{¶15} First, we address whether the State presented sufficient evidence that Mr. Yoder engaged in a pattern of conduct. As stated above, a "[p]attern of conduct" "means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.11(D)(1). "To determine whether two or more incidents were closely related in time, the incidents in question should be resolved by the trier of fact considering the evidence in the context of all the circumstances of the case." (Internal quotations omitted.) *Schmitz*, 2012-Ohio-2979, at ¶ 27, quoting *State v. Payne,* 178 Ohio App.3d 617, 2008-Ohio-5447, ¶ 12 (9th Dist.) "'A court must take everything into consideration when determining if [a person's] conduct constitutes a pattern of conduct, even if some of the person's actions may not, in isolation, seem particularly threatening.'" *R.C. v. J.G.*, 9th Dist. Medina No. 12CA0081-M, 2013-Ohio-4265, ¶ 12, quoting *Guthrie v. Long,* 10th Dist. Franklin No. 04AP-913, 2005-Ohio-1541, ¶ 12. Further, "[a] series of incidents may constitute a 'pattern of conduct' under the facts of a given case even if spread over the course of several years or across an intervening gap in time." *R.C. v. J.G.* at ¶ 12, citing *Middletown v. Jones,* 167 Ohio App.3d 679, 2006-Ohio-3465, ¶ 11 (12th Dist.).

{¶16} Viewing the evidence in a light most favorable to the State, a trier of fact could reasonably conclude that these incidents were of the same character such that they constituted a pattern of conduct under the circumstances of this case, even though the incidents in question were spread out over the course of several months (January of 2014, through September of 2014).

**{¶17}** Next, we address whether the State presented sufficient evidence that A.Y. believed Mr. Yoder would cause her physical harm.[2] "R.C. 2903.211 does not require explicit threats of physical harm." *R.C. v. J.G.*, at ¶ 11, citing *State v. Honeycutt,* 2d Dist. Montgomery No. 19004, 2002 WL 1438648, *6 (July 5, 2002). A.Y. testified that she was scared of Mr. Yoder because he would raise his voice at her when he was angry. A.Y. also testified that, after the July telephone call, she believed Mr. Yoder would "come in somewhere and hurt us or shoot us." Further, Patrolman Myrda testified that A.Y. contacted him after the July telephone call, and again after the September parking lot incident. Patrolman Myrda described A.Y. as concerned, fearful, somewhat anxious, and upset.

**{¶18}** Viewing the evidence in a light most favorable to the State, a trier of fact could reasonably conclude that A.Y. *believed* Mr. Yoder would cause her physical harm.

**{¶19}** Lastly, we address whether the State presented sufficient evidence that Mr. Yoder was aware that his conduct would probably cause A.Y. to believe that he would cause her physical harm. According to A.Y., Mr. Yoder acknowledged that he saw her at Fiore's with her new boyfriend. After informing A.Y. that he now "know[s] what [her] boyfriend looks like," Mr. Yoder threatened: "one of these times you are going to be somewhere with your boyfriend and I'm going to walk in and you won't know that I'm there and * * * I won't guarantee what will happen. But it will be something you don't like." A.Y. reported this incident to Patrolman Myrda, who then contacted Mr. Yoder and urged him to stop all communications and "leave

---

[2] We decline to address Mr. Yoder's argument regarding mental distress. Pursuant to R.C. 2903.211(A)(1), the State must either prove that: (1) A.Y. believed that Mr. Yoder would cause her physical harm or (2) Mr. Yoder actually caused A.Y. mental distress. Here, the State opted to put on evidence that A.Y. believed Mr. Yoder would cause her physical harm. The State did not put on any evidence of actual mental distress.

[A.Y.] alone." However, Mr. Yoder did not heed Patrolman Myrda's warning. Instead, he approached A.Y. in a parking lot, causing her to contact the police a second time.

{¶20} Viewing the evidence in a light most favorable to the State, a trier of fact could reasonably conclude that Mr. Yoder should have known that his actions would probably cause A.Y. to believe he would cause her physical harm because: (1) Mr. Yoder admitted to watching A.Y. and her boyfriend at Fiore's; (2) Mr. Yoder threatened to find the couple again in the future; and (3) Mr. Yoder stated that something bad would happen at that time. Further, even after Patrolman Myrda informed Mr. Yoder about A.Y.'s complaint and asked him to stop communicating with her, Mr. Yoder still attempted to flag A.Y. down and speak with her in a parking lot.

{¶21} Based upon the above-stated facts, and viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of menacing by stalking proven beyond a reasonable doubt. *See Jenks,* 61 Ohio St.3d at paragraph two of the syllabus.

**Manifest Weight**

{¶22} Mr. Yoder also argues that his conviction for menacing by stalking is against the manifest weight of the evidence. However, in his brief, Mr. Yoder argues only that the State presented no evidence on certain elements of his conviction. "[Mr. Yoder] fails to set forth 'any argument concerning the credibility of the evidence presented or the weight of the credible evidence.'" *State v. Schmitz,* 2012-Ohio-2979, ¶ 36, quoting *State v. Wilson,* 9th Dist. Summit No. 25100, 2011-Ohio-4072, ¶ 21. "If an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone,* 9th Dist. Summit No.

18349, 1998 WL 224934, *8 (May 6, 1998); *see also State v. Harmon*, 9th Dist. Summit No. 26426, 2013-Ohio-2319, ¶ 6.

**{¶23}** Because Mr. Yoder only presented a sufficiency argument, we decline to conduct a manifest weight analysis on his behalf. *See Schmitz* at ¶ 36, *see also* App.R. 16(A)(7) (the brief of an appellant shall include "[a]n argument containing the contentions of the appellant * * * and the reasons in support of the contentions * * *.").

**{¶24}** Mr. Yoder's sole assignment of error is overruled.

### III

**{¶25}** Mr. Yoder's sole assignment of error is overruled. The judgment of the Wayne County Municipal Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Wayne County Municipal Court, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

MOORE, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

CHRISTINA I. REIHELD, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and NATHAN R. SHAKER, Assistant Prosecuting Attorney, for Appellee.