[Cite as *State v. Harmon*, 2013-Ohio-2319.]

STATE OF OHIO        )               IN THE COURT OF APPEALS
                       )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT     )

STATE OF OHIO                       C.A. No.      26426

     Appellee

     v.                                APPEAL FROM JUDGMENT
                                     ENTERED IN THE
ALEXANDER H. HARMON          COURT OF COMMON PLEAS
                                     COUNTY OF SUMMIT, OHIO
     Appellant                     CASE Nos.     CR 11 06 1481
                                                CR 09 12 3811

DECISION AND JOURNAL ENTRY

Dated: June 5, 2013

---

BELFANCE, Judge.

{¶1} Alexander Harmon appeals his convictions from the Summit County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} This case arises, in large part, from the tumultuous relationship between Mr. Harmon and M.V., with whom he has two daughters. On December 28, 2009, M.V. called 911 to report that Mr. Harmon had attacked her, thrown her out of their house, and was keeping their infant daughter. The police arrived and ultimately arrested Mr. Harmon.

{¶3} On March 19, 2010, while Mr. Harmon was awaiting trial on the charges stemming from the December 28, 2009 incident, M.V. called 911 to report that Mr. Harmon had attacked her while she was holding their daughter. On March 27, 2010, M.V again called 911 to report that Mr. Harmon had shoved her to the floor and kicked her while she held their daughter. Over a year later, on May 31, 2011, M.V. reported another violent incident with Mr. Harmon.

The police encountered Mr. Harmon in the early hours of June 1, 2011, when they arrested him after a short car chase. In the course of the arrest, Mr. Harmon told the officers that he would kill them.

{¶4} Mr. Harmon was initially indicted on January 5, 2010, for domestic violence, resisting arrest, and obstructing official business stemming from the December 2009 incident. As a result of the incidents on March 19, 2010, March 27, 2010, May 31, 2011, and June 1, 2011, Mr. Harmon was indicted on six counts of domestic violence, three counts of endangering children, three counts of aggravated menacing, and one count each of aggravated burglary, burglary, driving under suspension, and obstructing official business.[1] Mr. Harmon's 2010 and 2011 indictments were joined, and the cases were tried together before a jury. With respect to the charges stemming from the December 2009 incident, the jury acquitted Mr. Harmon of domestic violence but found him guilty of resisting arrest and obstruction of official business. With respect to the charges stemming from the 2010 and 2011 incidents, the jury acquitted Mr. Harmon of aggravated burglary and two counts of domestic violence but convicted him of the remaining charges. The trial court sentenced Mr. Harmon to an aggregate prison term of four years.

{¶5} Mr. Harmon has appealed, raising four assignments of error for our review. For ease of discussion, we have rearranged Mr. Harmon's assignments of error.

II.

ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE THE STATE FAILED TO ESTABLISH ON THE RECOR[D] SUFFICIENT EVIDENCE TO SUPPORT THE CHARGES LEVIED AGAINST [MR.]

---

[1] Mr. Harmon was also indicted on two counts of disrupting public services, but those charges were dismissed by the State before trial.

HARMON IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶6} Mr. Harmon's third assignment of error is that his convictions are not supported by sufficient evidence. In his brief, Mr. Harmon combines this assignment of error with his fourth assignment of error, in which he argues that his convictions are against the manifest weight of the evidence. However, Mr. Harmon does not develop any argument regarding the sufficiency of the evidence, instead focusing solely on the manifest weight of the evidence, and we will not create one for him. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. No. 18349, 1998 WL 224934, *8 (May 6, 1998). Nevertheless, our review of the record reveals that his convictions are supported by sufficient evidence. Accordingly, his third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

[MR.] HARMON'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE * * * IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶7} In Mr. Harmon's fourth assignment of error he argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶8} In reviewing a challenge to the weight of the evidence, the appellate court

[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶9} We initially note that Mr. Harmon's arguments focus solely on whether the alleged domestic violence and child endangering occurred on March 19, 2010, March 27, 2010,

and May 31, 2010.[2] He has not developed any argument regarding his convictions for burglary, driving with a suspended license, aggravated menacing, obstructing official business, and resisting arrest. Therefore, we confine our analysis to his convictions for domestic violence and child endangerment. *See Cardone*, 1998 WL 224934, at *8; App.R. 16(A)(7).

{¶10} Mr. Harmon was convicted of violating R.C. 2919.22(A) by committing child endangering. R.C. 2919.22(A) provides, in pertinent part, that "[n]o person, who is the parent * * * of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." He was also convicted of domestic violence. R.C. 2919.25(A) provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member[.]" R.C. 2919.25(C) provides: "No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶11} For ease of discussion, we have divided the events at issue in this case into the separate days on which they occurred.

**March 19, 2010**

{¶12} Based on the events of March 19, 2010, Mr. Harmon was convicted of violating R.C. 2919.22(A) by committing child endangering. He argues that his conviction was against

---

[2] Mr. Harmon was acquitted of the domestic violence charge stemming from the December 2009 indictment.

the manifest weight of the evidence because M.V. recanted her initial statements to police at trial.

{¶13} M.V. was called as the court's witness. During cross-examination by the State, M.V. admitted that she had called 911 on March 19, 2010, and reported that Mr. Harmon had attacked her. She also admitted that she had written a statement for the police that night in which she claimed that Mr. Harmon had choked her while she was holding their daughter. Her written statement was consistent with her 911 call. When questioned by Mr. Harmon's counsel, M.V. stated that she had lied about Mr. Harmon attacking her. According to M.V., she had come home from work, and Mr. Harmon told her he was leaving her because he had found out she was seeing someone else. He also told M.V. that he was taking their daughter with him. M.V. then called 911, claiming that Mr. Harmon had forced his way into the house and started hitting her while she held their daughter in her arms. However, she testified that none of that was true, explaining that Mr. Harmon lived with her and had a key to the apartment. She also said that she loved Mr. Harmon.

{¶14} Officer Michael Radak testified that he was dispatched in response to M.V.'s 911 call. Officer Radak observed red marks on M.V.'s chest. According to Officer Radak, M.V. told him that Mr. Harmon had forced his way into the apartment, choked her, and threw her around the apartment, all while she was holding their daughter. Officer Radak testified that he did not detect any odor of alcohol on M.V. and that she appeared to be sober.

{¶15} Officer Jeffrey Kubasek responded to the 911 call with Officer Radak. He testified that M.V. had redness on her chest and neck and that she was crying and appeared shaken. She told him that Mr. Harmon had forced his way into the apartment. After Officer Kubasek and Officer Radak had finished speaking with M.V., she had a relative come get her

because she did not want to stay in the apartment. According to Officer Kubasek, she reported that Mr. Harmon had taken her keys during the assault.

{¶16} Mark Adam, a paramedic, treated M.V. on March 19, 2010. His report indicated that M.V. had indicated that she had lost consciousness during the incident with Mr. Harmon that night and that Mr. Harmon had pushed her against the refrigerator repeatedly.

{¶17} Mr. Harmon argues that, because M.V. testified that she had lied to the police about him forcing his way into the house and attacking her, his conviction for child endangerment on March 19, 2010, is against the manifest weight of the evidence. There was evidence at trial that Mr. Harmon had choked M.V. and shoved her while she held their daughter, which would constitute creating a substantial risk of harm to their daughter. While M.V. did deny that Mr. Harmon had ever harmed her, Officer Radak testified that he observed red marks on M.V.'s chest and her hair stuck to the refrigerator doors, which the jury could have seen as corroborating M.V.'s initial story to him that Mr. Harmon had attacked her. Given M.V.'s relationship with Mr. Harmon, her statements that she loved him, and how thoroughly her statements at trial contradicted her statements to the police, the jury could reasonably have questioned M.V.'s credibility and believed that her initial statements to the police were more truthful than her trial testimony. Thus, after a thorough review of the record, we cannot conclude that Mr. Harmon's conviction for child endangerment on March 19, 2010, is against the manifest weight of the evidence.

**March 27, 2010**

{¶18} Based on the events of March 27, 2010, Mr. Harmon was convicted of violating R.C. 2919.22(A) by committing child endangering and R.C. 2919.25(A) and (C) by committing domestic violence. Mr. Harmon argues that his convictions are against the manifest weight of

the evidence because M.V. recanted her statements to the police and because there was no evidence presented that M.V. was injured.

{¶19} M.V. admitted that she called 911 again on the evening of March 27, 2010. Although she testified that Mr. Harmon lived with her at the time, she also acknowledged that a protection order was in effect, which provided that Mr. Harmon should not have been at her house. She also agreed that she had written a statement for the police that night, in which she claimed that she came home from work to find Mr. Harmon in the apartment. When she told him to leave, he threw her to the ground and kicked her in the face. The jury heard the 911 call M.V. made at the time of the incident. M.V.'s written statement was consistent with what she told the 911 operator during the call.

{¶20} M.V. testified on cross-examination by Mr. Harmon's counsel that Mr. Harmon, after the March 19, 2010 incident, had given her another chance. According to M.V., Mr. Harmon "[j]ust takes [her] back * * *. [She] always call[s] him and he'll come back to the house and [they] make up." However, when she came home from work on March 27, 2010, he again threatened to move out of the house because of her drug and alcohol abuse.

{¶21} Officer Tim Wypasek testified that he responded to a 911 call at 717 Druid Walk on March 27, 2010. Once there, he encountered M.V., whom he described as visibly shaken and flustered. She informed him that she had entered the apartment and discovered Mr. Harmon inside. She told him that Mr. Harmon had shoved her to the floor while she was holding their child in her arms and then proceeded to kick her in the head and face. Officer Wypasek testified that he observed red marks on M.V.

{¶22} Officer Jamie Donohue testified that he was partnered with Officer Wypasek on March 27, 2010, and that they responded to a 911 call at 717 Druid Walk. According to Officer

Donohue, M.V. was visibly upset and kept repeating "'I don't understand how he got in. How did he get in?'" Eventually, the officers learned from her that she had come home from work and found Mr. Harmon in the apartment. She told the officers that Mr. Harmon had thrown her on the floor and kicked her in the face. Officer Donohue also testified that he did not believe M.V. was intoxicated or under the influence of drugs on March 27, 2010.

{¶23} The defense called Stephen Dort, the paramedic who examined M.V. on March 27, 2010. He testified that he did not observe any visible injuries and noted that in his report. He also noted that M.V. complained of facial pain. However, there was no swelling, redness, or abrasions in the area she was complaining about. On cross-examination, Mr. Dort testified that being kicked does not necessarily result in an injury.

{¶24} Mr. Harmon argues that his convictions for domestic violence, and child endangerment on March 27, 2010, are against the manifest weight of the evidence because there was no evidence that M.V. was injured. Whether M.V. was injured is not relevant to whether Mr. Harmon created a substantial risk of harm to his daughter. *See* R.C. 2919.22(A). In addition, the absence of injury would not preclude the jury from finding that Mr. Harmon, by threat of force, knowingly caused M.V. to believe he would cause imminent physical harm. *See* R.C. 2919.25(C). However, the absence of injury does relate to the credibility of her statements to the police that Mr. Harmon had thrown her to the floor and kicked her while she held their daughter, which would constitute child endangerment. However, while M.V. testified at trial that she had lied to the police, Officer Wypasek testified that he had observed red marks on her when he spoke to her on March 27, 2010. Mr. Dort testified that, while he did not observe any injury on M.V., she did complain of facial pain and that a person could be kicked without causing an injury. Again, given M.V.'s relationship to Mr. Harmon, her statements that she

loved him, and how thoroughly her statements at trial contradicted her statements to the police, the jury could reasonably have questioned M.V.'s credibility and believed that her initial statements to the police were more truthful than her trial testimony. Thus, we cannot conclude that jury lost its way and created a manifest miscarriage of justice when it found Mr. Harmon guilty of domestic violence and child endangerment on March 27, 2010.

**May 31, 2011**

{¶25} Based on the events of May 31, 2011, Mr. Harmon was convicted of violating R.C. 2919.25(A) and (C) by committing domestic violence and R.C. 2919.22(A) by committing child endangering. Mr. Harmon argues his convictions are against the manifest weight of the evidence because M.V. recanted her statements to the police and contradicted the testimony of Rachel Jones, M.V.'s neighbor.

{¶26} Ms. Jones testified that, on May 31, 2011, she heard M.V. screaming for help, and saw Mr. Harmon grabbing and shoving M.V. in the hallway of the apartment complex where they lived. When Ms. Jones attempted to intervene, Mr. Harmon began yelling at her. Ms. Jones testified that, after Mr. Harmon yelled at her, she called 911. According to Ms. Jones, M.V. had the newborn with her during this incident. M.V. told Ms. Jones that the incident was not abnormal, that she did not know why she stayed with Mr. Harmon, and that she was scared to leave him because Mr. Harmon had threatened to kill her.

{¶27} Sergeant Daniel Engelhart testified that he responded to a call about domestic violence at 1046 Nadia Court on May 31, 2011. He encountered M.V. who walked towards him, and he could tell that she was upset and scared. M.V. told Sergeant Engelhart that Mr. Harmon had slapped her in the face, and he observed a red mark on her face. M.V. told him that Mr.

Harmon had prevented her from calling the police, had taken her keys, and left. Sergeant Engelhart testified that she did not appear to be intoxicated or using drugs.

{¶28} In contrast to the above testimony, M.V. testified that, on May 31, 2011, she chased Mr. Harmon out of the apartment while carrying the couple's newborn because she did not want him to leave, but she denied that Mr. Harmon had hit or grabbed her.

{¶29} Mr. Harmon argues that his convictions stemming from the events of May 31, 2011, are against the manifest weight of the evidence because M.V.'s trial testimony contradicts that of Ms. Jones. Ms. Jones testified that Mr. Harmon grabbed and shoved M.V., and Sergeant Engelhart testified that M.V. reported being slapped by Mr. Harmon. While M.V. denied that Mr. Harmon had hit, grabbed, or otherwise engaged in any violence against her, she did testify that she chased Mr. Harmon from the apartment while holding their newborn, and Ms. Jones testified that M.V. had the couple's newborn with her in the hallway, which is where Ms. Jones saw Mr. Harmon grab and shove M.V. The jury was required to weigh the credibility of the witnesses in light of the competing testimony. Upon review of the record, we do not discern anything apart from M.V.'s testimony that calls the credibility of Ms. Jones and Sergeant Engelhart into question. Thus, we cannot say that, to the extent that the jury believed the testimony of Sergeant Engelhart and Ms. Jones, it lost its way. Accordingly, we cannot conclude that his convictions for domestic violence and child endangerment on May 31, 2011, are against the manifest weight of the evidence.

{¶30} Mr. Harmon's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT ALLOWED EXPERT TESTIMONY REGARDING DOMESTIC VIOLENCE IN THE STATE'S CASE IN CHIEF IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S.

CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

**{¶31}** Mr. Harmon argues in his first assignment of error that the trial court should not have allowed Ms. Zedak to testify about battered-woman syndrome. He asserts that the trial court abused its discretion in allowing expert testimony when there was no established pattern of domestic violence. We disagree.

**{¶32}** When determining whether expert testimony about battered woman syndrome is admissible, the initial question is whether it is relevant. *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, ¶ 44. "Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse." (Internal quotations and citations omitted.) *Id*.

> Such seemingly inconsistent actions are relevant to a witness's credibility. Because the victim's credibility can be attacked during cross-examination of the victim or even during opening statements, the prosecution need not wait until rebuttal to present expert testimony on battered woman syndrome. Rather, such testimony may be presented as rehabilitative evidence during the state's case-in-chief.

(Internal quotations and citations omitted.) *Id*.

**{¶33}** In this case, Mr. Harmon does not argue that the expert testimony lacked relevance under Evid.R. 401.[3] The record in this case establishes that M.V., despite 911 calls and reports to the police, repeatedly recanted her allegations of abuse at trial. Testimony showed that M.V. recanted numerous reports of abuse, professed her love for the defendant and blamed

---

[3] We note that Mr. Harmon does not argue that Ms. Zedak lacked the necessary qualifications of an expert on the battered-woman syndrome.

herself for some of the incidents. M.V.'s recantation was the focus of cross-examination by the State and defense. Accordingly, the battered-woman syndrome testimony could be relevant and helpful to explain M.V.'s recantations of alleged abuse. *Haines* at ¶ 44. Moreover, M.V.'s credibility was at issue in light of her recantation. Thus, as in *Haines*, expert testimony "could address those supposed anomalies." *Id.* at ¶ 46.

{¶34} However, "while such testimony can be relevant for explaining a victim's behavior, it cannot be considered relevant if there is no evidence that the victim suffers from battered-woman syndrome." *Id*. "'The battering relationship itself is often described as cyclical in nature, with three distinct phases: tension building, confrontation, and contrition.'" *Id.* at ¶ 48, quoting Hawes, *Removing the Roadblocks to Successful Domestic Violence Prosecutions: Prosecutorial Use of Expert Testimony on the Battered Woman Syndrome in Ohio*, 53 Clev.St.L.Rev. 133, 137 (2005). "Evidence *generally* establishing the cycles of a battering relationship is an appropriate foundation for battered-woman-syndrome expert testimony." (Emphasis added.) *Haines* at ¶ 48. "[I]n order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman." (Internal quotations and citations omitted.) *Id.* at ¶ 49.

{¶35} Mr. Harmon argues that the State did not establish that M.V. suffered from battered-woman syndrome. According to Mr. Harmon, there was no evidence of the tension-building phase in the battered-woman cycle, although he concedes that the State presented evidence concerning confrontation and contrition, or honeymoon, stages of the cycle. Thus, he contends that the trial court improperly allowed the jury to infer that that the tension-building

phase of the cycle was present solely by virtue of the existence of the two phases. However, a set of rigid foundational requirements is unnecessary, rather

> the party seeking to introduce battered woman syndrome evidence must lay an appropriate foundation substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior.

*Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, at ¶ 47.

{¶36} The evidence against Harmon generally established the cycles of a battered-woman syndrome. The prosecution established that multiple, successive incidents of abuse were followed by reconciliation. In the most recent instance, a third party, Ms. Jones, stated she witnessed violence against M.V. Ms. Jones testified that M.V. told her that the violent incident was not abnormal, that she did not know why she stayed with Mr. Harmon, and that she was scared to leave him because Mr. Harmon had threatened to kill her. We also note that M.V. admitted that their disagreements often rise to the level of screaming at each other and also admitted that, even when he was in jail, Mr. Harmon ordered her to stop visiting a friend and go home. M.V. also testified that Mr. Harmon had often threatened to call Children's Services to have her children taken from her. While M.V. characterized Mr. Harmon's threats about calling Children's Services as attempts to have her stop her drug habit, they could also constitute evidence of the tension-building stage of the cycle given that, according to Ms. Zedak's testimony, the tension-building phase typically consists of the abuser making threats or otherwise intimidating the woman, which can include using children against her. *See also id.*, quoting Hawes, 53 Clev.St.L.Rev. at 137 ("'During the 'tension building' phase, the woman is generally compliant, often feeling as though she deserves the abuse.'"); *Haines* at ¶ 50 ("The prosecution established through testimony about the October 2001 incident and the March 2002 incident that

Haines's psychological abuse and controlling behavior were followed first by an outburst of violence and then by Haines's supposed regret and a reconciliation."). Thus, the State laid the necessary foundation substantiating that M.V.'s behavior was consistent with generally recognized symptoms of battered woman syndrome and that she behaved in such a manner that the jury would be aided by expert testimony.

{¶37} However, Mr. Harmon also argues that the testimony was impermissible because it was not rehabilitative in nature. *Haines* involved a situation in which the State had called the victim as its witness to testify. The victim testified to ongoing abuse and was subjected to cross-examination by defense counsel during which the victim admitted to staying with the defendant despite repeated abuse. *See Haines* at ¶ 45. In rebuttal, the State sought to introduce expert testimony concerning the battered-woman syndrome. *See id.* at ¶ 14. In this context, the Ohio Supreme Court determined that "when a [domestic abuse] victim's credibility is challenged upon cross-examination during the state's case-in-chief, the state may introduce expert testimony regarding battered-woman syndrome to aid the trier-of-fact in understanding the victim's state of mind, e.g., to explain why she returned to the defendant despite his aggressions toward her." *Id.* at ¶ 65. Mr. Harmon argues that, unlike the victim in *Haines*, M.V.'s credibility was not challenged by defense counsel during the State's case-in-chief. Instead, because M.V. was called as the court's witness, it was the State that called M.V.'s credibility into question, not the defense, and, therefore, the State should not have been allowed to attempt to rehabilitate her.[4]

---

[4] Mr. Harmon also appears to suggest in passing that the trial court should not have called M.V. as its own witness. However, he never develops any argument on this point, *Cardone*, 1998 WL 224934, at *8, and, regardless, one of Mr. Harmon's attorneys asserted on the record that she had no objection to the trial court calling M.V. as its witness. *State v. Hairston*, 9th Dist. No. 05CA008768, 2006-Ohio-4925, ¶ 50, quoting *Lester v. Leuck*, 142 Ohio St. 91 (1943), syllabus ("Invited error prohibits a party from 'tak[ing] advantage of an error which he himself invited or induced the trial court to make.'").

However, it is undisputed that the defense also questioned M.V. about why her testimony at trial differed from her statements to the police, characterizing her statements to the police as false reporting. In other words, M.V.'s recantation of successive instances of domestic violence was the focus of both the State and the defense. Furthermore, Mr. Harmon's counsel informed the jury during her opening argument that M.V. had recanted her statements to the police. *See Haines* at ¶ 44 ("Because the victim's credibility can be attacked during cross-examination of the victim *or even during opening statements*, the prosecution need not wait until rebuttal to present expert testimony on battered woman syndrome. Rather, such testimony may be presented as rehabilitative evidence during the state's case-in-chief.") (Emphasis added.) (Internal quotations and citations omitted.).

**{¶38}** *Haines* clearly recognizes that one of the proper uses of expert testimony about battered-woman syndrome is to explain a victim's "recanting allegations of abuse." (Internal quotations and citations omitted.) *Id.*. That was exactly what was at issue here with M.V. testifying at trial that the abuse never occurred despite numerous 911 calls and reports to the police. Although we recognize that *Haines* was decided under a different procedural posture, we do not discern anything in *Haines* that suggests that it is inapplicable to a situation where the victim is called as the court's witness under circumstances where the victim has recanted the allegations of abuse and an appropriate foundation has been laid that the victim suffers from battered-woman syndrome. Thus, given the evidence in the record before us, we cannot say that the trial court abused its discretion when it allowed Ms. Zedak to testify about battered-woman syndrome.

**{¶39}** Mr. Harmon's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED [MR.] HARMON'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION WHEN IT FAILED TO SEVER THE 2009 CASE FROM THE 2011 CASE.

{¶40} In Mr. Harmon's second assignment of error, he argues that the trial court erred in denying his motion to sever the indictments. We disagree.

{¶41} "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * in an indictment, * * * the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14. To prevail on a motion to sever, a defendant has the burden of demonstrating three facts:

> (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.

*State v. Schaim*, 65 Ohio St.3d 51, 59 (1992).

{¶42} Mr. Harmon filed two motions to sever in the trial court: one to sever the counts of the 2011 indictment and one to sever the 2010 and 2011 indictments after the trial court granted the State's motion for joinder. Mr. Harmon renewed both motions at the close of the State's case. However, on appeal, Mr. Harmon limits his argument to the second motion, and we limit our analysis accordingly.

{¶43} We first examine Mr. Harmon's claim of prejudice. "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *Id*. Mr. Harmon argues that the

evidence of the incident occurring in December 2009 as contained in the 2010 indictment would not have been admissible in the 2011 case. However, even assuming, without deciding, that the evidence concerning the December 28, 2009 incident would not be admissible in the 2011 case, we cannot conclude that he suffered prejudice because the evidence of the December 28, 2009 incident was simple and distinct from the incidents at issue in the 2011 indictment. *See id.*

{¶44} Mr. Harmon makes a very limited argument in this regard. He contends that the evidence was not simple and distinct because "[s]everal of the witnesses testified about multiple events that were similar enough that the jury was not able to reach separate, distinct conclusions regarding each offense." However, he does not point to any specific evidence or testimony in support of this argument. *See* App.R. 16(A)(7). Furthermore, he does not explain how the jury was confused about the specific events occurring in December 2009 with those occurring many months later. He does suggest that the testimony of the officers is "confusing[ because] [s]ome officers were involved in more than one [] event, while others could testify to only a portion of an event." While it is true that Officers Radak, Kubasek, Wypasek, and Donohoe testified about events on different days, their testimony about the events of December 28, 2009, was limited to Mr. Harmon's behavior when he was arrested whereas their testimony about the events of March 19 and March 27, 2010, involved their interaction with M.V. and did not involve any interaction with Mr. Harmon. Thus, it is unclear why the jury would be unable to separate their testimony about their interviews of M.V. in March 2010, from their testimony about Mr. Harmon's actions during his arrest three months earlier.

{¶45} Mr. Harmon also argues that during opening statements, the prosecutor and his counsel confused the dates regarding incidents occurring on March 19 and March 27, 2010. However, he does not explain how this is relevant to consideration of whether the 2009 incident

was simple and distinct from the incidents of March 2010, May 31, 2011, and June 1, 2011. There was no suggestion that the prosecutor or his counsel displayed any confusion regarding the December 2009 incident as set forth in the 2010 indictment. Ultimately, Mr. Harmon was acquitted of the domestic violence charge associated with the 2009 incident.

{¶46} Thus, based on Mr. Harmon's appellate arguments, we cannot conclude that the trial court abused its discretion when it denied his motion to sever the 2010 indictment from the 2011 indictment because he has failed to demonstrate prejudice. *See Schaim*, 65 Ohio St.3d at 59. His second assignment of error is overruled.

### III.

{¶47} Mr. Harmon's assignments of error are overruled, and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

_____

EVE V. BELFANCE
FOR THE COURT

MOORE, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

PAUL GRANT, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.