[Cite as *State v. Young*, 2014-Ohio-1715.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No. 26725 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| STEVEN A. YOUNG | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 12 05 1248(A) |

DECISION AND JOURNAL ENTRY

Dated: April 23, 2014

BELFANCE, Presiding Judge.

{¶1} Steven Young appeals from his convictions in the Summit County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} On April 9, 2012, Tocarra Varner was smoking marijuana in her house with Tyeshia Shellman while her boyfriend Kevin Moore took a bath and her children played upstairs. Two men entered the house and proceeded to rob her and Mr. Moore. Although one of the men was wearing a bandanna over his face, the bandanna slipped down, and Ms. Varner recognized the man as Anthony Shellman, Ms. Shellman's brother. The other man did not wear any mask, but Ms. Varner did not recognize him as anyone that she knew. Eventually, the men and Ms. Shellman left, and one of Ms. Varner's children called the police. Ms. Varner told the police that she believed the Shellmans were both involved in the robbery and that there was a second man whom she could not identify.

**{¶3}** The day after the robbery, Ms. Varner came to the police station to speak with Detective David Garro about the robbery. Ms. Varner indicated that an acquaintance had told her that Mr. Young had probably been involved in the robbery. Ms. Varner told the police that she had looked Mr. Young up on Facebook and had recognized him as the second robber. Detective Garro was unable to locate a Facebook page associated with Mr. Young, but he showed Ms. Varner a picture of Mr. Young, asking her "'Is this the correct Steve Young?'" Ms. Varner indicated that it was.

**{¶4}** A few weeks after the robbery, Mr. Young was arrested while in the company of Thomas Garrett, who was a member of the Bloodline Gang, and Richard Martin. During the course of arresting Mr. Young, the police discovered two firearms in the apartment, which Mr. Martin was charged with possessing.

**{¶5}** Mr. Young was indicted for aggravated burglary, safecracking, and two counts of aggravated robbery as well as underlying firearm specifications for the aggravated burglary and aggravated robbery charges. A supplemental indictment charged Mr. Young with having a weapon while under disability, participating in a criminal gang, and two counts of kidnapping. The kidnapping and participating in a criminal gang charges had underlying firearm specifications,[1] and the kidnapping charges had underlying gang specifications. The jury found Mr. Young guilty on all counts, and the trial court sentenced him to an aggregate term of 22 years in prison.

**{¶6}** Mr. Young has appealed, raising four assignments of error for our review. For ease of discussion, we have rearranged his assignments of error.

---

[1] The having a weapon while under disability charge also had an underlying firearm specification that was eventually dismissed.

II.

ASSIGNMENT OF ERROR II

DUE PROCESS WAS DENIED AS THE EVIDENCE WAS INSUFFICIENT TO PROVE A CRIMINAL GANG COUNT OR GANG SPECIFICATION AND THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

**{¶7}** In Mr. Young's second assignment of error, he challenges the sufficiency of the evidence related to his conviction for participating in a criminal gang and argues that all of his convictions are against the manifest weight of the evidence.

**Sufficiency**

**{¶8}** "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶9}** Mr. Young argues that the State presented insufficient evidence from which the jury could find that Mr. Young had violated R.C. 2923.42 by participating in a criminal gang.[2] R.C. 2923.42(A) provides that

---

[2] Mr. Young also argues that the jury's findings regarding the gang specifications were not supported by sufficient evidence because the gang specifications were improperly indicted. However, Mr. Young has not pointed to any authority to support his argument, *see* App.R. 16(A)(7), and, in any case, his argument is outside the scope of this assignment of error. *See Taylor v. Hamlin-Scanlon*, 9th Dist. Summit No. 23873, 2008-Ohio-1912, ¶ 12 ("[A]n appellant's assignment of error provides this Court with a roadmap to guide our review.").

> [n]o person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.

Pertinent to this case, R.C. 2923.41(C) defines "criminal conduct" as "the commission of, an attempt to commit, a conspiracy to commit, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of this section * * *." The offenses listed in R.C. 2923.41(B)(1) are "(a) [a] felony * * * (b) [a]n offense of violence * * * [and] (c) [a] violation of section 2907.04, 2909.06, 2911.211, 2917.04, 2919.23, or 2919.24 of the Revised Code, section 2921.04 or 2923.16 of the Revised Code, section 2925.03 of the Revised Code if the offense is trafficking in marihuana, or section 2927.12 of the Revised Code." Pursuant to R.C. 2901.01(A)(9), aggravated robbery (R.C. 2911.01), aggravated burglary (R.C. 2911.11), and kidnapping (R.C. 2905.01) are offenses of violence.

{¶10} Ms. Varner testified that, on April 9, 2012, Ms. Shellman called her to borrow $25. Ms. Varner agreed to loan Ms. Shellman the money, and Ms. Shellman came over while Ms. Varner was taking a bath. Ms. Varner testified that her children, ages 12 and 6, were playing upstairs and that her boyfriend Kevin Moore was also home at the time. Ms. Shellman left but returned a short time later, and Ms. Varner smoked marijuana with her. At some point, Ms. Shellman got up to purportedly look for a trashcan, but Ms. Varner actually saw her unlock the side door to the house. The women then went into Ms. Varner's bedroom so that Ms. Varner could iron some clothes. Mr. Moore was in the bathroom taking a bath during this time.

{¶11} While Ms. Varner was ironing, she saw two men run past her window, and they quickly entered the house. According to Ms. Varner, one of the men had his face covered by a

bandana, but the other man made no attempt to conceal his face. The man with his face exposed blocked Ms. Varner from exiting her bedroom, giving her ample opportunity to observe his features. Meanwhile, the other man, who Ms. Varner recognized as Mr. Shellman when his mask slipped, got Mr. Moore from the bathtub and also brought the children downstairs. Mr. Shellman brought Mr. Moore into the bedroom and forced him to open the safe in the closet. Ms. Varner testified that Mr. Shellman was brandishing a gun during the incident. At some point during the incident, Ms. Shellman casually walked out of the house.

{¶12} After the men left, Ms. Varner's younger son dialed 911 but hung up. The operator called back, and Ms. Varner told the police to come. Ms. Varner spoke with the detective who arrived on the scene. She told the detective that Mr. Shellman was one of the robbers but that she did not know who the second man was. However, the next day, she looked up Mr. Young on Facebook on the advice of a friend and recognized Mr. Young as the second robber. Ms. Varner went to the police station and spoke with Detective Garro.

{¶13} Ms. Shellman testified that she went to Ms. Varner's home twice on April 9, 2012: once to borrow $25 and another time to smoke marijuana. Ms. Shellman also testified that she followed Ms. Varner into her bedroom because Ms. Varner had to iron some clothes. While they were in the bedroom, Ms. Varner told Ms. Shellman to look out the window, and Ms. Shellman saw Mr. Young walking to the side door of the house. Mr. Young entered the house, came into the bedroom, and told Ms. Varner and Ms. Shellman to lay down.

{¶14} According to Ms. Shellman, she did not see her brother until he was coming down the stairs with Ms. Varner's children; Mr. Shellman was holding a gun at the time. Mr. Shellman then went into the bathroom to get Mr. Moore, whom he forced to go into the bedroom. When Mr. Shellman went into the bedroom with Mr. Moore, Ms. Shellman left.

{¶15} Later on the evening of April 9, 2012, a message was sent to Ms. Shellman's phone from Mr. Young's Facebook account. It said, "My fault earlier, but I had to make it seem like u ain't have shit to do wit it* * *hope u dnt FSKW about how it went down. U know [I] LOVE U too[.]" Ms. Shellman explained that "FSKW" meant "feel some type of kind of way." Ms. Shellman understood Mr. Young's message to be referring to the robbery at Ms. Varner's house. Ms. Shellman also testified that she received text messages from Mr. Young's cell phone on April 11, 2012, in which Mr. Young asked Ms. Shellman how Ms. Varner had learned his name and who had given him up.

{¶16} Mr. Shellman testified that he had seen Mr. Young walking and had given him a ride because he had not seen Mr. Young in a while. Mr. Young gave Mr. Shellman a number at which he could contact him. According to Mr. Shellman, Mr. Young participated in the robbery because, like Mr. Shellman, Mr. Young was in need of money. Mr. Shellman testified that he wanted to rob Mr. Moore because he knew Mr. Moore dealt drugs so he would likely have money and drugs to steal.

{¶17} According to Mr. Shellman, he and Mr. Young agreed that Mr. Young should bring his gun on the robbery. However, once they entered the home, Mr. Shellman took the gun from Mr. Young because he wanted to make sure that no one was shot. He tried to locate Mr. Moore, looking upstairs and then in the bathroom where he found Mr. Moore in the shower. Mr. Moore told Mr. Shellman that he had money in his pants and drugs in his car. Mr. Shellman went through Mr. Moore's pants and found $500 and small quantities of heroin, crack cocaine, and marijuana. After the men left the house, they divided up the money and the drugs.

{¶18} Mr. Shellman testified that he did not speak with Mr. Young again about the robbery until they were both in jail. According to Mr. Shellman, Mr. Young wanted Mr.

Shellman to take total responsibility for the robbery because Mr. Young had just gotten out of prison after serving a number of years.

{¶19} Detective David Garro testified that he had investigated the robbery at Ms. Varner's home. Based on information gained from Ms. Shellman's phone, he subpoenaed phone records related to the number she claimed to be that of Mr. Young. According to Detective Garro, the records he received from the phone company indicated that the phone was registered to Mr. Young, and those phone records were entered into evidence.

{¶20} Officer Criss testified extensively about gang activity in Akron and specifically about the Bloodline gang. He testified that the Bloodline gang typically wore red and black and that it was affiliated with the South Bronx Gangsters, which was an older gang in Akron.

{¶21} Ms. Shellman and Mr. Shellman testified that Mr. Young was a member of the Bloodline gang. Ms. Shellman also testified that, following the robbery, Mr. Young changed his Facebook picture from a picture of him and a woman to a picture of money lying on a red bandanna. Mr. Shellman testified that he was affiliated with the South Bronx Gangsters but denied that the group was a criminal gang, instead claiming that they were a neighborhood group. However, Officer Criss testified that the South Bronx Gangsters was actually an umbrella gang, which was an overarching gang encompassing a number of smaller gangs, including the Bloodline.

{¶22} We initially note that Mr. Young does not dispute that there was sufficient evidence from which the jury could conclude that he was a member of the Bloodline gang and that he knew that the Bloodline gang had engaged in a pattern of criminal activity. Nor does he argue that there was insufficient evidence to support his convictions for aggravated robbery, aggravated burglary, or kidnapping, all of which are felonies and offenses of violence. *See* R.C.

2923.41(B)(1)(a)-(b); R.C. 2901.01(A)(9). Instead, Mr. Young's appellate arguments focus solely on the prohibition in R.C. 2923.42(A) that a gang member shall not "purposely promote, further, or assist any criminal conduct[.]"

{¶23} Mr. Young argues that he could not be found guilty of participating in a criminal gang because he did not promote, further, or assist criminal conduct of a fellow gang member because there was no evidence that Mr. Shellman or Ms. Shellman were members of the same gang. *See State v. Stallings*, 150 Ohio App.3d 5, 2002-Ohio-5942, ¶ 17 (9th Dist.) ("[F]or a defendant to be criminally liable under R.C. 2923.42(A), he would also have to be criminally liable as an aider or abettor to a crime committed by a fellow gang member or members."). However, Mr. Shellman testified that he robbed Ms. Varner and Mr. Moore with Mr. Young's assistance and that he was a member of the South Bronx Gangsters. Officer Criss testified that the South Bronx Gangsters were affiliated with the Bloodline gang and that the Bloodline gang was actually a subsidiary of the South Bronx Gangsters.

{¶24} Furthermore, Mr. Young's argument ignores the alternative prohibition in R.C. 2923.42(A) that a member of a criminal gang may not "purposely commit or engage in any act that constitutes criminal conduct," which would include aggravated robbery and kidnapping, and Mr. Young has not developed any argument as to whether there was insufficient evidence to support a finding of guilty under that portion of R.C. 2923.42(A). *See* App.R. 16(A)(7); *State v. Harmon*, 9th Dist. Summit No. 26426, 2013-Ohio-2319, ¶ 6. Ms. Varner, Ms. Shellman, and Mr. Shellman all testified that Mr. Young participated in an armed robbery at Ms. Varner's home. Accordingly, there was sufficient evidence from which the jury could conclude that Mr. Young, while he was an active member in the Bloodline gang which he knew engaged in a pattern of criminal conduct, purposely committed criminal conduct. Thus, his conviction for

participating in a criminal gang in violation of R.C. 2923.42(A) was supported by sufficient evidence.

**Manifest Weight of the Evidence**

{¶25}  Mr. Young also argues that his convictions are against the manifest weight of the evidence.  In reviewing a challenge to the weight of the evidence, the appellate court

> [m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶26}  Mr. Young testified in his own defense at trial and denied having anything to do with the robbery at Ms. Varner's home.  He testified that he had been with Ms. Shellman and Mr. Shellman later on the day of the robbery and that there had been an argument.  According to Mr. Young, the text from his Facebook account that was sent that night was referring to that argument and that he was apologizing to Ms. Shellman for his behavior.  Mr. Young also testified that he was surprised to learn that he was wanted in connection with a robbery, which was why he texted Ms. Shellman asking how Ms. Varner had learned his name.  He admitted that he had not turned himself in after learning that he was wanted but asserted that he had only done so because he wanted to be with his girlfriend on her birthday.  Mr. Young further testified that, when he was first in jail, Mr. Shellman acted normal towards him but, as time went on, Mr. Shellman became increasingly hostile.

{¶27}  Micah Mosley also testified for the defense.  Mr. Mosley testified that he was in the same pod in the jail as Mr. Shellman.  Accordingly to Mr. Mosley, he had spoken with Mr. Shellman during one of the programs offered at the jail and that Mr. Shellman had admitted that

Mr. Young had not been involved in the robbery. However, according to Mr. Mosley, Mr. Shellman indicated that he planned to say Mr. Young was involved because he thought having a second defendant would lessen the amount of prison time he would serve.

{¶28} Ms. Varner, Mr. Shellman, and Ms. Shellman testified that Mr. Young was the other robber who participated in the robbery with Mr. Shellman. He argues that their testimony should not be given any weight. Accordingly, we confine our analysis to whether the jury lost its way when it found that Mr. Young was the second person who robbed Ms. Varner. *See State v. Jackson*, 9th Dist. Summit No. 26757, 2013-Ohio-5557, ¶ 5.

{¶29} Mr. Young argues that Ms. Varner's testimony should be discredited because she was a drug dealer and her story as to how she came to identify Mr. Young was unbelievable. He also argues that the testimony of Mr. Shellman and Ms. Shellman was not credible because they had accepted plea deals in exchange for their testimony. However, the jury was aware of all of this information from the testimony and cross-examination of Mr. Shellman, Ms. Shellman, and Ms. Varner and, thus, could decide what weight to give their testimony. *See id.* at ¶ 21, citing *State v. Andrews*, 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28. All three testified that there was a second man involved in the robbery and that the second man was Mr. Young. Furthermore, the State presented phone records that supported Ms. Shellman's testimony that Mr. Young had texted her about the robbery and to ask how Ms. Varner had learned his name.

{¶30} Under the circumstances, we cannot conclude that the jury lost its way and committed a manifest miscarriage of justice by finding that Mr. Young was the second man present at the scene and had committed the offenses at issue in this case. *See Andrews* at ¶ 28 ("A verdict is not against the manifest weight of the evidence because the jury chose to believe

the State's witnesses rather than the defense witnesses."). Mr. Young's second assignment of error is overruled.

ASSIGNMENT OF ERROR I

FAILURE TO MOVE TO SUPPRESS I[D]ENTIFICATION TESTIMONY AND FAILURE TO MAKE CLOSING ARGUMENT DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL[.]

**{¶31}** Mr. Young argues in his first assignment of error that he received ineffective assistance of counsel because his trial counsel did not move to suppress Ms. Varner's identification of him and because trial counsel did not make a closing argument.

**{¶32}** In order to prevail on an ineffective assistance of counsel claim, a defendant "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 62, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984).

**Ms. Varner's Identification**

**{¶33}** Mr. Young first contends that his counsel's performance was deficient for failing to file a motion to suppress Ms. Varner's identification of him as impermissibly suggestive. However, assuming counsel was deficient in failing to challenge the Ms. Varner's identification, Mr. Young does not develop any argument as to how, counsel's failure to do so affected the outcome of the proceedings. *See* App.R. 16(A)(7); *Harmon*, 2013-Ohio-2319, at ¶ 6. Mr. Shellman and Ms. Shellman both identified Mr. Young as the other person who came into Ms. Varner's house the day of the robbery. Ms. Shellman also testified that she received text messages from Mr. Young's Facebook account and that those text messages referred to the

robbery.  The phone records also indicated that messages were sent from Mr. Young's phone to Ms. Shellman's phone from which an inference about his involvement could be made.  Thus, based on the evidence presented at trial, we cannot say that, assuming Mr. Young's counsel was deficient for failing to move to suppress Ms. Varner's identification of Mr. Young, there is a reasonable probability that the deficiency affected the outcome of the trial.

**Failure to Make Closing Argument**

**{¶34}**  Mr. Young also argues that his trial counsel was ineffective for not making a closing argument during the trial.  Admittedly, trial counsel's decision not to make a closing argument in this case is troubling as the closing argument is counsel's last chance to plead the defendant's case.  Furthermore, while there may be strategic reasons to not make a closing argument,[3] we cannot discern any in this case.  Nevertheless, assuming counsel's performance was deficient, under the circumstances of this case, we cannot conclude that there is a reasonable probability that trial counsel's failure to make a closing argument affected the outcome of the trial.

**{¶35}**  It is important to remember that, while important, argument is not evidence going to the question of guilt.  *State v. Frazier*, 73 Ohio St.3d 323, 338 (1995) ("It is well settled that statements made by counsel in opening statements and closing arguments are not evidence.").  Furthermore, the evidence of Mr. Young's involvement in this case was substantial.  Ms. Varner, Mr. Shellman, and Ms. Shellman all testified that Mr. Young was the second robber, and there were phone records that also implicated Mr. Young in the crime.  In addition, trial counsel thoroughly cross-examined the witnesses in this case and generally appears to have been well

---

[3] For example, the prosecutor's closing argument could ignore certain charges or the prosecutor could give a very brief closing, both of which could *possibly* justify a decision not to make a closing argument so as to avoid the prosecutorial rebuttal.  *See State v. Burke*, 73 Ohio St.3d 399, 404-405 (1995); *State v. Apanovitch*, 33 Ohio St.3d 19, 24-25 (1987).

prepared in his defense of Mr. Young. Finally, and significant to our analysis, Mr. Young testified in this case, meaning the jury was able to hear his side of the story directly from him, and, therefore, argument of counsel was not the sole means of conveying the defendant's position. Mr. Young testified that he was not present during the robbery; if believed, Mr. Young's testimony alone would have created reasonable doubt as to whether he committed the crimes. Given that the jury clearly did not believe Mr. Young based on its verdicts, it is difficult to see how counsel's closing arguments would have made a difference.

{¶36} Given the importance of closing argument, we emphasize that our decision today should not be read as a bright-line rule regarding whether trial counsel's failure to make a closing argument constitutes ineffective assistance of counsel. If counsel's performance at trial was lacking, if there had been less evidence of guilt, or even if the defendant did not testify, our decision well could be different. However, under these specific circumstances, we cannot conclude that Mr. Young was prejudiced by his trial counsel's failure to make a closing argument.

{¶37} Accordingly, Mr. Young's first assignment of error is overruled.

ASSIGNMENT OF ERROR III

ADMISSION OF GUN EVIDENCE AND EXPERT TESTIMONY WAS IN PLAIN ERROR, CONTRARY TO LAW, CAUSED SUBSTANTIAL PREJUDICE, AND DENIED DUE PROCESS[.]

{¶38} Mr. Young argues in his third assignment of error that the trial court should not have permitted the State to introduce the evidence that guns were found when he was arrested. He also argues that the trial court committed plain error by allowing Officer Criss to give expert testimony about gangs. Because the evidence of the guns was admitted during Officer Criss's testimony, we address Officer Criss's testimony first.

{¶39} Generally, "we review a trial court's admission of evidence for abuse of discretion." *State v. Truitt*, 9th Dist. Summit No. 25527, 2011-Ohio-6599, ¶ 30. However, because Mr. Young never objected to Officer Criss's testimony, we review the admission of the testimony for plain error. *See* Crim.R. 52(B). To establish plain error,

> "[f]irst, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights [ ]' [to the extent that it] * * * affected the outcome of the trial."

*State v. Hardges*, 9th Dist. Summit No. 24175, 2008-Ohio-5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). However, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶40} Officer Criss testified at length about gang activity generally as well as about gangs in Akron. Mr. Young argues that Officer Criss should not have been permitted to testify because he had not been qualified as an expert and had not submitted an expert report in compliance with Crim.R. 16(K). However, Mr. Young has not developed any argument as to how these alleged errors affected the outcome of his trial. *See Hardges* at ¶ 9. *See also* App.R. 16(A)(7); *Harmon*, 2013-Ohio-2319, at ¶ 6. As noted above, plain error should only be recognized under exceptional circumstances and to prevent a manifest miscarriage of justice. Based upon the record before us, we cannot find plain error when Mr. Young has not developed any argument regarding how, assuming error occurred, the outcome of the trial was affected by the error. Thus, we cannot conclude that Mr. Young has established that plain error occurred in this case. *See Hardges* at ¶ 9.

{¶41} Turning to Mr. Young's argument regarding the admission of the firearms in this case, we agree that the firearms were of questionable relevance.[4] Mr. Young was arrested at the residence of Richard Martin. Thomas Garrett was also present. Mr. Garrett, like Mr. Young, was a known member of the Bloodline gang; however, no evidence was submitted at trial that would indicate that Mr. Martin was affiliated with the Bloodline gang or any gang for that matter. During the arrest, police discovered a rifle and a handgun behind Mr. Martin's couch. Over the objection of Mr. Young's counsel, the trial court admitted the guns as evidence going to whether the Bloodline gang still existed or was still active.

{¶42} Assuming that the firearms were improperly admitted, we cannot conclude that the error affected Mr. Young's substantial rights. *See* Crim.R. 52(A). There was no dispute at trial that Mr. Young had previously been involved in the Bloodline gang, and Mr. Young admitted during his testimony that he had gone to prison on charges related to his gang activities. Multiple witnesses also testified that Mr. Young was involved in the robbery at Ms. Varner's house and text messages from his phone also implicated him. Thus, under the circumstances, we cannot discern how, assuming the guns should not have been admitted, that the evidence affected Mr. Young's substantial rights, especially since there was no evidence that he was in possession of the guns.

{¶43} Accordingly, Mr. Young's third assignment of error is overruled.

ASSIGNMENT OF ERROR IV

IMPOSITION OF MULTIPLE AND CONSECUTIVE TERMS OF IMPRISONMENT FOR COUNTS AND SPECIFICATIONS WAS CONTRARY TO LAW AND PLAIN ERROR IN VIOLATION OF DUE PROCESS AND DOUBLE JEOPARDY PROTECTIONS[.]

---

[4] We note that the State does not address this portion of Mr. Young's third assignment of error.

**{¶44}**  Mr. Young argues in his fourth assignment of error that all his convictions should merge.  Mr. Young also argues that the trial court erred when it ordered that some of Mr. Young's sentences and specification-terms should be served consecutively.  Finally, Mr. Young argues that the trial court should not have considered a letter discovered by the State following his trial when it imposed its sentence.

**Allied Offenses**

**{¶45}**  Mr. Young argues that "[m]erger of allied offenses was not properly determined * * *" because the trial court applied a "bright line" rule of multiple victims inherently making multiple offenses of dissimilar import.  We disagree that the trial court clearly applied a "bright line" rule when it determined that some of Mr. Young's offenses do not merge.  However, in any case, our review of the allied offense issue is de novo, *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1, and Mr. Young has not developed any argument as to why the trial court's ultimate decision not to merge some of the offenses was incorrect.  *See* App.R.  16(A)(7); *Harmon*, 2013-Ohio-2319, at ¶ 6.  *See also State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, ¶ 18 ("[T]he defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act.") (Internal quotations and citation omitted.).  Accordingly, given Mr. Young's lack of argument and that it is his burden to establish entitlement to merger, we cannot conclude that Mr. Young has demonstrated that the trial court erred when it did not merge all of his convictions.

**Gang Specifications**

**{¶46}**  Mr. Young argues that the trial court could not impose a prison sentence for the gang specification to kidnapping because all of his convictions should have merged.  However, as discussed above, Mr. Young has not demonstrated that his offenses should have merged.  He

also reiterates his contention that the gang specifications were improperly indicted. Again, Mr. Young's arguments are outside the scope of the stated assignment of error, and we decline to address them. *See Taylor*, 2008-Ohio-1912, at ¶ 12.

**Firearm Specifications**

**{¶47}** Mr. Young argues that the trial court should not have ordered the firearm specifications for the aggravated robberies to be served consecutively, citing R.C. 2929.14(B)(1)(b). R.C. 2929.14(B)(1)(b) provides, in pertinent part, "Except as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a),[5] of this section for felonies committed as part of the same act or transaction." Mr. Young argues that the aggravated robberies were "part of one transaction" and, therefore, the trial court's imposition of consecutive sentences was in violation of R.C. 2929.14(B)(1)(b).[6] However, R.C. 2929.14(B)(1)(b) is subject to R.C. 2929.14(B)(1)(g), which provides that

> [i]f an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

On its face, R.C. 2929.14(B)(1)(g) required the trial court to impose two prison terms for the firearm specifications to Mr. Young's aggravated robbery convictions, and Mr. Young does not

---

[5] R.C. 2929.14(B)(1)(a) governs the imposition of prison terms for firearm specifications like the ones at issue in this case.

[6] We note that the State's entire response to Mr. Young's argument regarding the firearm specifications is that it "disagrees with [Mr.] Young's characterization of these events as one transaction."

develop any argument as to why R.C. 2929.14(B)(1)(g) would not apply in this case. *See* App.R. 16(A)(7); *Harmon*, 2013-Ohio-3394, at ¶ 6. Accordingly, we find Mr. Young's arguments about his firearm specifications to be without merit.

**The Letter and Mr. Young's Fifth Amendment Rights**

{¶48} Mr. Young's argument is essentially two-fold: (1) the trial court should not have considered the letter that the State presented at sentencing and (2) that the trial court violated his Fifth Amendment right against self-incrimination at his sentencing hearing.

{¶49} The letter in question was found in the glove box of a vehicle purchased by an Akron University Safety Officer at auction. The return address on the envelope indicates that the letter was sent by Mr. Young from jail, and the contents of the letter set out in great detail the testimony he was asking the recipient to provide at his trial. The letter specifically requests that the recipient say that Mr. Young was with him and two other individuals during the time of the robbery. The letter also urges the recipient to do this for Mr. Young because Mr. Young would do it for him if the roles were reversed.

{¶50} R.C. 2929.19 grants broad discretion to the trial court to consider any information relevant to the imposition of a sentence. R.C. 2929.19(A) allows the state and the defendant to "present information relevant to the imposition of sentence in the case[,]" and R.C. 2929.19(B) requires the trial court to "consider the record, any information presented at the hearing by any person pursuant to division (A) of this section, and, if one was prepared, the presentence investigation report * * * and any victim impact statement * * *." In other words, R.C. 2929.19 sets out a procedure less formal than an evidentiary hearing for interested parties to submit arguments and information to the trial court. *See State v. Bowser*, 186 Ohio App.3d 162, 2010-

Ohio-951, ¶ 14 (2d Dist.), quoting *Nichols v. United States*, 511 U.S. 738, 747 (1994) ("[T]he sentencing process is 'less exacting than the process of establishing guilt.'").

**{¶51}** We note that Mr. Young's trial counsel never objected to the trial court considering the letter, and he has not provided legal authority as to why the trial court's consideration of the letter resulted in a sentence that was contrary to law. *See* App.R. 16(A)(7).

**{¶52}** Nor do we find Mr. Young's Fifth Amendment argument to be meritorious. Again, Mr. Young's argument is vague, and he has not explained how his Fifth Amendment rights were implicated as he was not being compelled to speak about the letter. *See* App.R. 16(A)(7); *Harmon*, 2013-Ohio-2319, at ¶ 6. Accordingly, we fail to see how Mr. Young's Fifth Amendment rights were implicated here.[7]

**Consecutive Sentences**

**{¶53}** Finally, Mr. Young challenges the actual imposition of his sentences. This Court utilizes the test set forth in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, when reviewing criminal sentences.

> First, [we] must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision in imposing the term of imprisonment is reviewed under the abuse-of-discretion standard.

*Id*. at ¶ 26.

**{¶54}** R.C. 2929.14(C)(4) states that:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive

---

[7] We note that our conclusion about Mr. Young's Fifth Amendment right against self-incrimination is confined to the offenses in this case. We express no opinion as to whether the use of his statements at sentencing would be admissible in relation to other charges.

sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

"[W]hile trial courts are not required to explain their reasoning on the record, they are required to make the findings specified in R.C. 2929.14(C)(4) at the sentencing hearing on the record prior to imposing consecutive sentences." *State v. Berkenstock*, 9th Dist. Summit Nos. 26721, 26815, 2013-Ohio-4576, ¶ 9.

{¶55} Mr. Young does not dispute that the trial court made the R.C. 2929.14(C)(4) findings during his sentencing hearing. Instead, he appears to suggest that the trial court should have provided detailed reasoning underlying the findings. However, that is not required of the trial court, *Berkenstock* at ¶ 9, and Mr. Young has not argued that the findings were not supported by the record. *See* App.R. 16(A)(7). Accordingly, based on Mr. Young's limited argument, we cannot conclude that the trial court erred in imposing consecutive sentences in this case, and Mr. Young's fourth assignment of error is overruled in its entirety.

III.

{¶56} Mr. Young's assignments of error are overruled, and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

WHITMORE, J.
CONCURS.

HENSAL, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

MARK H. LUDWIG, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.